## State Authority Loans to Retirement Boards

MARGIOTTI, Attorney General, December 15, 1937. — We have for consideration your recent request that the Public School Employes' Retirement Board and the State Employes' Retirement Board of the Commonwealth of Pennsylvania be advised on certain questions growing out of a proposed loan to be made by the said boards to the General State Authority.

The State Employes' Retirement Board and the Public School Employes' Retirement Board are about to enter into an agreement with the General State Authority, whereby they are to advance certain moneys on certain specified projects during the course of construction of said projects and receive therefor ad interim certificates, which, upon completion of the work, are to be exchanged for definitive bonds of the General State Authority.

Before entering into this agreement, the said boards desire to be advised as to whether the General State Authority is legally empowered and authorized to (a) erect and construct, under the provisions of existing law, the particular improvement or project for which advances are to be made, and (b) to borrow money for such purposes, and (c) that the Commonwealth or any other entity involved, is legally authorized and empowered to enter into contracts to lease and leases with the said authority for the particular project or improvement, and liable for the payment of the rentals to be specified in said lease, and (d) whether appropriations for the payment of said rentals are preferred appropriations of the Commonwealth. Also whether the authority will have the legal and financial capacity to pay its bonds. These questions will be answered in order.

Is the General State Authority legally empowered and authorized to erect and construct, under the provisions of existing law, the particular improvement or project for which the advances are to be made?

The answer to this question is "Yes". Section 4 of the Act of May 18, 1937, P. L. 676, which amends section 4 of the General State Authority Act of June 28, 1935, P. L. 452, defines the purposes of the State authority to be as follows:

"The Authority is created for the purpose of constructing, improving, maintaining, and operating sewers, sewer systems, and sewage treatment works for State institutions of every kind and character (heretofore or hereafter constructed), public buildings for the use of the Common-

wealth, State arsenals, armories, and military reserves, State airports and landing fields, State institutions of every kind and character (heretofore or hereafter constructed), additions and improvements to land grant colleges, State highways, and bridges, tunnels, and traffic circles on State highways, swimming pools, and lakes on State land, and dams and improvements to river embankments (any and all the foregoing being herein called 'projects')".

The term "project" is also defined in section 2(c) of the General State Authority Act, supra, as follows:

"The term 'project' shall mean any structure, facility, or undertaking which the Authority is authorized to construct, improve, maintain, or operate under the provisions of this act."

The Supreme Court in the case of Kelley v. Earle et al., 325 Pa. 337, 354 (1937), in which it passed upon all phases of the General State Authority Act of 1935, in answer to objections as to the indefiniteness of the meaning of the word "projects", as used in the act, stated as follows:

"However, as the word 'projects' appears in the title of the Act, its intended meaning is perfectly clear to any reader. During the past five years it has been a recognized designation for public works and improvements."

We have examined the character of all of the projects set forth in the list attached hereto, and find that not only do they come within the clear provisions of the Acts of 1935 and 1937, but have been specifically declared constitutional in the case of Kelley v. Earle et al., supra, wherein the court, after enumerating and discussing the various classes of projects, set forth in section 4 of the Act of 1935, which is almost identical with section 4 of the Act of 1937, held that the act was constitutional, and in its final and concluding statement said:

"Having decided that the General State Authority Act and the undertakings in pursuance of it are constitutional, it follows that the bill of complaint must be dismissed."

We therefore conclude that the General State Authority is legally empowered and authorized to erect and construct, under the provisions of existing law, all of the projects set forth in the list attached hereto.

Is the General State Authority legally empowered and authorized to borrow moneys for the purpose of erecting and constructing the projects in question?

The answer to this question is "Yes". Section 1 of the Act of 1937, supra, amending, inter alia, section 4 of the Act of 1935, clearly gives the authority the right to borrow money and issue any form of evidence of indebtedness or obligation. The act provides as follows:

"(i) To borrow money, make and issue negotiable notes, bonds, and other evidences of indebtedness or obligations (herein called 'bonds') of the Authority, and to secure the payment of such bonds, or any part thereof, by pledge or deed of trust of all or any of its revenues, rentals, and receipts, and to make such agreements with the purchasers or holders of such bonds or with others in connection with any such bonds, whether issued or to be issued, as the Authority shall deem advisable, and in general to provide for the security for said bonds and the rights of the holders thereof."

Is the Commonwealth or any other entity involved, legally authorized and empowered to enter into contracts to lease and/or leases with the General State Authority for the particular projects or improvements, and liable for the payment of the rentals to be specified in said lease or leases?

This question is answered squarely and clearly by section 2 of the Act of 1937, supplementing and adding to the Act of 1935, sec. 9.1, which is as follows:

"Contracts to Lease and Leases by Department from Authority.—The department shall have power and authority, with the approval of the Governor, to enter into contracts with the Authority, to lease as lessee from the Authority any or all of the projects undertaken by the

Authority for a term, with respect to each project constructed, not exceeding thirty (30) years, at such rental or rentals as may be determined by the Authority, and upon the completion of the said projects, the department shall have power and authority, with the approval of the Governor, to lease as lessee any or all of the projects completed by the Authority for a term, with respect to each project leased, not exceeding thirty (30) years, at such rental or rentals as may be determined by the Authority."

The "department" referred to in the amendatory section above quoted is defined in the General State Authority Act of 1935, sec. 2(b), as follows:

. "The term 'Department' shall mean the Department of Property and Supplies as the same exists under The Administrative Code of one thousand nine hundred and twenty-nine, or as it may exist by amendment of said code."

In addition to the provisions of the Acts of 1935 and 1937, quoted above, the power to enter into contracts for the leasing of proper and adequate offices, rooms and other accommodations, outside of the Capitol buildings, for any department, board or commission, or agency of the State Government, is specifically vested in the Department of Property and Supplies by the provisions of sections 2401 and 2402 of The Administrative Code of April 9, 1929, P. L. 177, as amended. Subsection (d) of section 2402 of The Administrative Code provides as follows:

"It shall be unlawful for any other department, board, commission, or agency of the State Government to enter into any leases, but the Department of Property and Supplies shall act only as agent in executing leases for departments, boards, and commissions, the expenses of which are paid wholly or mainly out of special funds, and, in such cases, the rentals shall be paid out of such special funds."

The Commonwealth, therefore, through the Department of Property and Supplies, is legally authorized to enter into contracts to lease and/or leases with the Gen-

eral State Authority for all of the projects set forth in the list attached hereto.

As to the Commonwealth's liability for the payment of rentals, to be specified in said lease or leases, generally, the authority to incur an obligation carries with it a liability to meet that obligation. Especially is this so in the case of rentals provided in the contemplated leases, which, as more at length discussed below, are current and ordinary expenses of the State Government. Not only is the Commonwealth liable for the payment of the rents, but these rentals enjoy a priority and preference over and above all other appropriations and debts.

Are appropriations for the payment of said rentals preferred appropriations of the Commonwealth?

The answer to this question is "Yes". In Commonwealth ex rel. v. Liveright, etc., et al., 308 Pa. 35, 67 (1932), the Supreme Court, in discussing and passing upon the question of preferred appropriations, stated as follows: "The control of the state's finances is entirely in the legislature, subject only to these constitutional limitations; and, except as thus restricted, is absolute. . . . .

"Among the constitutional requirements are the provisions (article IX, section 12) that 'The moneys of the State, over and above the necessary reserve, shall be used in the payment of the debt of the State, either directly or through the sinking fund,' and, by article IX, section 13, that 'The moneys held as necessary reserve shall be limited by law to the amount required for *current expenses.*' We had a state debt when the Constitution was adopted and the money required to pay that debt, or any state debt, was supplied, inter alia, by the assignment to the sinking fund of any part of the revenue over and above ordinary and current expenses of government. A survey of the Constitution would indicate that the ordinary current expenses of government would be the expenses of the executive, judicial and legislative departments of government, and of public schools. It was the

intention of the framers of the fundamental law to safeguard and protect these ordinary expenses, that the government might exist as such. Therefore, they have a preference or prior claim on all moneys of the Commonwealth over all other expenditures, expenses, debts, or appropriations. We have so held with regard to such expenses of municipalities. 'Current expenses have first claim on ordinary revenues and contemplate operating expenses': Georges Twp. v. Union Trust Co., 293 Pa. 364, 370. The Constitution requires a reserve to be set up sufficient to take care of these preferred claims, and that such reserve be limited by law; but if the legislature fails to so limit it, it is the duty of the fiscal officers to safeguard the ordinary current monthly expenses of government."

Unquestionably, therefore, the rentals which the State Government obligates itself to pay under the leases that it will execute with the General State Authority are for the use and occupation of buildings, improvements, and facilities necessary and incidental to the proper functioning of the various departments of the State Government, and, therefore, constitute "ordinary" and "current" expenses of the State Government. Further, in the recent case of Kelley v. Earle et al., supra, the Supreme Court, in discussing and differentiating between debts and current expenses of the State, held as follows:

"It was conceded at the argument that contracts or leases to meet recurrent needs the obligation of which is to be met by the Commonwealth from current revenues extending beyond the biennium are not within the constitutional limitation. . . . Any expense that recurs with regularity and certainty and is necessary for [its] existence . . . or for the health, comfort and perhaps convenience of the inhabitants may well be called an ordinary expense': Brown v. City of Corry, 175 Pa. 528. What condition is more recurring than the perennial obligation of this Commonwealth to care for helpless, indigent, epileptic, feeble-minded, blind, tubercular and other patients or

inmates that overflow the institutions named in the Act? Wherein are the objects to be attained by the Act by the building program a new burden? These conditions are with us always and recur with an oppressive regularity."

Will the General State Authority have the legal and financial capability to pay its bonds?

This last question is one of mixed law and fact. The authority undoubtedly has the legal capacity to pay its bonds, but as to whether it will be financially capable, will depend upon whether its receipts for the rental of the projects to the State Government will be sufficient to pay interest on the bonds, costs of administration, and the accumulation of a fund sufficient to pay the principal of the bonds at maturity. Undoubtedly, in fixing the amount of the rentals for the projects to be leased to the Commonwealth, the General State Authority will take into consideration the amount invested for the erection of the projects, the costs of administration of the State authority, the interest payments on said bonds, and the payment of the principal to meet bonds at maturity, and will fix a rental sufficient to meet these obligations.

We have stated above, and based our statements upon a construction of the acts of assembly in each case involved, that the General State Authority is legally empowered and authorized to construct and erect the projects, borrow money for the same, issue its obligations for said borrowed money, and enter into all necessary contracts to effectuate its purposes.

The basic Act of 1935, better known as the General State Authority Act, to which the Act of 1937 is an amendment, has been passed upon by the Supreme Court as to its constitutionality in the case of Kelley v. Earle et al., wherein the Supreme Court in an opinion clearly outlined the purpose for which the General State Authority was erected, and after a discussion of the various questions involving the constitutionality of the act, held that the act was constitutional. The court in part held as follows, p. 344:

"In considering the question of constitutionality, due regard must be had to the Commonwealth's position, the projects to be undertaken, the character of the contract and the parties with whom it is made. To enforce a harsh, literal interpretation of the Constitution when considering the legality of the leases of the projects herein mentioned, which are essential to the life of the State and the comfort, health or security of its people, a construction opposed to all business concepts, would violate all rules of interpretation and cause loss of the respect necessary to the life of that document. While it is the duty of the courts to uphold the Constitution, it is likewise their duty not to declare an act unconstitutional unless it is imperatively necessary to do so."

While the question was not raised by your inquiry, we might add that in formal opinion dated November 22, 1937, State Authority Bonds, 31 D. & C. 100, we advised the General State Authority that bonds of the authority are legal investments for trust funds under the provisions of the Act of May 28, 1937, P. L. 1037, which amends the Fiduciaries Act of June 7, 1917, P. L 447, and the Act of July 1, 1937, P. L. 2687, and which specifically provides that:

". . . any departmental administrative board and commission or other agency of the Commonwealth, shall have power to invest funds and moneys in his or its possession and control in bonds issued by the General State Authority in which the full faith and credit of the Authority is pledged, and such bonds shall be deemed legal investments for all such purposes."

Therefore, funds of the State Employes' Retirement Board and the Public School Employes' Retirement Board may legally be invested in bonds of the General State Authority.

In conclusion we are of the opinion, and you are so advised, that:

1. The General State Authority is legally empowered and authorized to erect and construct, under the provi-

sions of existing law, the particular improvements or projects set forth in the list attached hereto.

2. That the General State Authority is legally empowered and authorized to borrow moneys for such purposes.

3. That the Commonwealth or any other entity involved is legally authorized and empowered to enter into contracts to lease and/or leases with the said authority for the particular project or improvement set forth in the list attached hereto, and that the Commonwealth is liable for the payment of the rentals provided for in said contracts to lease and/or leases.

4. That all appropriations for the payment of said rentals are preferred appropriations of the Commonwealth.

5. That the General State Authority is legally empowered and authorized to pay its bonds at maturity.

6. That the General State Authority is legally authorized and empowered to issue ad interim certificates during the progress of construction of the projects, which ad interim certificates are to be exchanged for definitive bonds of the authority upon completion of the specific projects for which the money is advanced.

7. That the State Employes' Retirement Board and the Public School Employes' Retirement Board are legally empowered and authorized to purchase the bonds of the General State Authority.